UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
STUDY LOGIC, LLC,

                      Plaintiff,

    - against -

CLEAR NET PLUS, INC., SAFETY SHIELD, INC.,
and ISAAC FROMER, aka YITZCHOK FROMER
aka YEVGEN FROMER aka YITZCHOK ISAAC
FROMER,

                      Defendants.
-------------------------------------------------------------------X

**MEMORANDUM
AND  O R D E R**

11 CV 4343 (CLP)

On September 9, 2011, plaintiff Study Logic LLC ("Study Logic") commenced this

action against defendants Clear Net Plus Inc. ("Clear Net"), Safety Shield, Inc. ("Safety Shield")

(collectively, "corporate defendants"), and Isaac Fromer ("Fromer" or "individual defendant")

(collectively, "defendants"), alleging claims for unfair competition and false designation of origin

in violation of 15 U.S.C. § 1125(a), trademark dilution in violation of 15 U.S.C. § 1125(c),

trademark cyberpiracy in violation of 15 U.S.C. § 1125(d), common law claims of unfair

competition, violations of New York General Business Law §§ 349 and 360-l, breach of contract,

and breach of fiduciary duty. Plaintiff also claims that the court should pierce the corporate veil

by allowing plaintiff to collect damages from defendant Fromer in his personal capacity.

Despite proper service, defendants failed to answer or otherwise move in response to the

Complaint. On October 13, 2011, the Clerk of Court entered a default as to each of the

defendants and thereafter, plaintiff moved for a default judgment. On January 4, 2012, the

district court issued an Order directing the parties to notify the court if they objected to the case

1

being reassigned to the undersigned to decide damages.

On January 4, 2012, plaintiff consented to the reassignment, and when no objections were received from defendants, the case was reassigned to the undersigned Magistrate Judge. This Court then issued an Order, dated January 24, 2012, requiring the submission of any additional papers relating to damages by February 24, 2012. An inquest hearing was held on April 18, 2012, at which defendants failed to appear.

Having received no submissions from defendants, the Court proceeds to consider plaintiff's request for damages and injunctive relief based on the papers filed and the evidence presented at the hearing.

For the reasons set forth below, the Court respectfully recommends that default judgment be granted and that plaintiff be awarded $74,935.64. The Court also Orders defendants to desist from using the studylogic mark and to transfer the www.studylogicdata.com domain to plaintiff.

## FACTUAL BACKGROUND

Plaintiff Study Logic is a New York corporation, with its principal place of business in Cedarhurst, N.Y. (Compl.[1] ¶ 6). Study Logic is a market research firm, specializing in data research for the food and beverage industries. (Id. ¶ 11; Nahmias Decl.[2] ¶ 4). According to the Complaint, Study Logic uses the trademark "studylogic" in its business and on all of its advertising, and it has done so since the firm's inception. (Compl. ¶ 14). Plaintiff alleges that it

_____

[1]Citations to "Compl." refer to plaintiff's Complaint filed on September 9, 2011.

[2]Citations to "Nahmias Decl." refer to the Declaration of Samuel Nahmias, Executive Vice President and Chief Executive Officer for Study Logic, in Support of Plaintiff's Motion for Default Judgment and Permanent Injunction, dated November 30, 2011.

2

has numerous domestic and foreign clients in the food and beverage industries who recognize the name "Study Logic" (id. ¶ 12), that the mark "studylogic" has gained national and international renown in the industries (id. ¶ 16; Nahmias Decl. ¶ 4), and that it has become inherently distinctive through plaintiff's efforts. (Compl. ¶ 17). Plaintiff alleges that through the exclusive use of the "studylogic" mark, plaintiff has built up its name and reputation (id. ¶ 18), and indeed, has been quoted in multiple business outlets due to its brand name and expertise. (Id. ¶ 13; Nahmias Decl. ¶ 6). Plaintiff alleges that the mark has been in its exclusive and continuous use for more than five years (Compl. ¶ 17), and that there is currently an application pending before the United States Patent and Trademark Office ("USPTO") for federal registration of the mark. (Id. ¶ 15; Nahmias Decl. ¶ 5).

Plaintiff claims that defendants Clear Net and Safety Shield[3] are New York corporations, each listing a principal place of business at 29 Church Avenue, Brooklyn, N.Y. (Compl. ¶¶ 7, 8). Defendant Fromer is alleged to be the director, officer, and/or controlling shareholder of both corporate entities during the relevant time period. (Id. ¶ 9). Plaintiff alleges that defendant Fromer has been managing the affairs of Clear Net and Safety Shield without regard to corporate structure and that he has used the assets of the corporations to further his own personal interests and to avoid personal liability for his infringing activities. (Id. ¶ 10).

Plaintiff alleges that in or around March 2006, it engaged defendant Fromer to build and register a website for Study Logic under the domain name www.studylogicdata.com (the "domain") for one of Study Logic's clients in the coffee and tea industry (the "Project"). (Id. ¶

---

[3]According to the Complaint, defendant Safety Shield's corporate status is currently inactive; a Dissolution by Proclamation/Anullment was filed on or about April 27, 2011. (Compl. ¶ 8).

3

19; Nahmias Decl. ¶ 9, Ex. F). According to the Complaint, Fromer insisted that the work contract and the nondisclosure agreement for the Project be made between plaintiff and Safety Shield. (Compl. ¶ 20; Nahmias Decl. ¶ 10; see Nahmias Decl., Ex. G). Plaintiff asserts that Fromer originally agreed to complete the Project for $1,500 (Nahmias Decl. ¶ 11), but he was eventually paid a total of approximately $4,500 for the work. (Id. ¶ 13,⁴ Ex. J).

Unbeknownst to plaintiff, Safety Shield was not in the business of building corporate websites; instead, it manufactured, imported, or marketed personal health and safety products. (Compl. ¶ 21; Nahmias Decl. ¶ 11). Plaintiff alleges that despite the fact that Safety Shield was named as a party to the contract and nondisclosure agreement, defendant Fromer never used Safety Shield's letterhead, email, or any other indicia of the company with respect to the Project; all communications were through Fromer's personal email address and cell phone. (Compl. ¶¶ 22, 23; Nahmias Decl. ¶ 11).

Although Fromer was to register the domain in Study Logic's name, Fromer told plaintiff that he would register it in his own name and then transfer the domain to plaintiff once the Project was complete. (Compl. ¶¶ 24, 25; Nahmias Decl. ¶ 10). On or around April 2, 2006, Fromer is alleged to have registered the domain under the name of Safety Shield, with Fromer as the Registrant and Administrator. (Compl. ¶ 26). Fromer also listed a Post Office Box as the registration address, instead of Safety Shield's address. (Id.) Plaintiff alleges that, once Fromer completed the Project, he failed to transfer the domain to plaintiff and instead kept it in Safety Shield's name. (Id. ¶ 27).

Plaintiff alleges that in or around April 2006, plaintiff discovered that defendant Fromer

---

⁴The Complaint alleges that Fromer was paid approximately $6,000. (Compl. ¶ 19).

4

was using the domain to advertise for Nadin Tea and Coffee ("Nadin"), a Russian tea and coffee brand that plaintiff believes to have been associated with defendant Fromer. (Compl. ¶ 63). When plaintiff's corporate client saw the advertisements for Nadin on the website that they had contracted with plaintiff to build for them, plaintiff contacted defendant Fromer. (Id. ¶ 65). Plaintiff claims that Fromer ignored their communication but removed the advertisements for Nadin soon after. (Id. ¶ 66).

Plaintiff alleges that, in the summer of 2008, during the course of updating its technology, it learned that it could not change the DNS settings for the website because the domain was still registered under the defendant Safety Shield's name. (Compl. ¶¶ 28-31; Nahmias Decl. ¶ 15). Mr. Nahmias claims that it was not until August 2008 that plaintiff discovered that Fromer had failed to transfer the domain. (Nahmias Decl. ¶ 14). On August 8, 2008, after plaintiff received no response to phone calls and an email to Fromer requesting that he transfer the domain name as previously agreed, plaintiff proceeded to register the domain www.studylogicdata.net (the "new domain"). (Compl. ¶ 33; Nahmias Decl. ¶ 15, Ex. K). Plaintiff thereafter used both the new and original domains until the original site stopped working in or around October 2009.[5] (Compl. ¶¶ 33, 34; Nahmias Decl. ¶ 16).

Plaintiff alleges that unbeknownst to it, Fromer re-registered the original domain with a new registrar, Enom, Inc. ("Enom"), under Safety Shield's name and cut off all functionality to the site in or around October 2009.[6] (Compl. ¶ 36; Nahmias Decl. ¶ 17). Also at that time,

---

[5]The Complaint alleges that the original website stopped working in or around November 2009. (Compl. ¶ 34).

[6]The Complaint alleges that defendant Fromer re-registered the website with Enom in or around November 2009. (Compl. ¶ 36).

5

Safety Shield began advertising its registration services in the WHOIS database entry for www.studylogicdata.com, listing Fromer's email address as its contact information. (Compl. ¶ 37). Continuing until February 2011, the WHOIS database entry for the domain at times advertised Safety Shield's registration services and advised viewers to visit Safety Shield's website. (Id.; Nahmias Decl. ¶ 17).

Plaintiff alleges that on or around March 2, 2011, defendant Fromer transferred the www.studylogicdata.com domain from defendant Safety Shield to defendant Clear Net, which then placed the domain up for sale on www.sedo.co.uk ("Sedo"), a website that serves as a marketplace for buying and selling domains and websites. (Compl. ¶¶ 38-40; Nahmias Decl. ¶ 18, Ex. L). Defendants allegedly continued to advertise for themselves in the WHOIS database entry for the domain, but they altered the advertisement to direct viewers to Clear Net's website instead of Safety Shield's site. (Compl. ¶ 42).

On or around July 27, 2011, after plaintiff learned that Fromer was attempting to sell the domain, plaintiff's counsel contacted Fromer and informed him that he was in violation of state and federal intellectual property laws and in breach of his fiduciary duties as plaintiff's agent. (Id. ¶ 43; Nahmias Decl. ¶ 19, Ex. M). On August 4, 2011, Fromer contacted plaintiff via telephone to respond to plaintiff's demand that he transfer the domain; during this conversation, Fromer indicated that he would transfer the name if plaintiff would reimburse him for renewal and transfer fees. (Compl. ¶ 44; Nahmias Decl. ¶ 19, Ex. M). Plaintiff alleges that it was never informed by Fromer of the expiration and renewals of the site,[7] but plaintiff nevertheless agreed

---

[7]According to plaintiff, Fromer originally purchased only one year of domain registration, which was renewed on April 2, 2007 and April 2, 2008. (Id. ¶ 45). When the site was transferred to Enom on April 2, 2009, defendant purchased two years of domain registration,

to reimburse Fromer, subject to proof that the renewal fees were actually paid. (Compl. ¶¶ 46, 47; Nahmias Decl. ¶ 19, Ex. M). On August 16, 2011, plaintiff's counsel received an email from a Clear Net email account stating that it would be "willing to transfer the domain upon payment of $750 representing the 4 year plus renewal fee and transfer fee." (Compl. ¶ 50; Nahmias Decl. ¶ 19, Ex. M). Plaintiff claims that it never received proof of actual payment, and that, based on the charges listed on the internet for the various domain registrars, defendants spent at most $41.47 in renewal fees and $11.50 in transfer fees. (Compl. ¶¶ 51-54; Nahmias Decl. ¶¶ 19, 20). Fromer thereafter cut off communications with plaintiff's counsel.

On September 9, 2011, plaintiff commenced this action, asserting three claims under the Lanham Act and five claims for violations of New York statutory and common law relating to unfair trade practices, unfair competition, and breach of contract and fiduciary duty. Plaintiff duly served defendants Clear Net and Fromer on September 14, 2011 (see Neuman Decl.[8] ¶ 7, Ex. B), and service was effected as to defendant Safety Shield on September 20, 2011. (Id.) When none of the defendants responded to the Complaint, the Clerk of Court entered a default against all three defendants. (Neuman Decl. ¶ 8, Ex. C). Plaintiff now seeks a default judgment awarding plaintiff statutory damages, punitive damages, compensatory damages, costs, and attorneys' fees, as well as entry of a permanent injunction ordering defendants to desist from using plaintiff's marks and to transfer the www.studylogicdata.com domain name to plaintiff Study Logic.

_____

which was then renewed once on April 2, 2011. (Id.)

[8]Citations to "Neuman Decl." refer to the Declaration of Jonathan E. Neuman, Esq., dated November 30, 2011, filed in connection with plaintiff's Notice of Motion for Default Judgment and Order Granting Injunctive Relief Against Defendants.

7

## DISCUSSION

### I. Default Judgment

#### A. Legal Standard

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. 55(a). Rule 55 sets forth a two-step process for an entry of default judgment. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993). First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case. See id. Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter a default judgment. See Fed. R. Civ. P. 55(b).

Providing guidance as to when a default judgment is appropriate, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. See Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and]. . .delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "[afford] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored," and doubts should be resolved in favor of the defaulting party. Id. Accordingly, plaintiff is not entitled to a default judgment as a matter of right simply because a party is in default. See Erwin

8

DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including (1) whether the grounds for default are clearly established; (2) whether the claims were pleaded in the complaint thereby placing the defendant on notice, see Fed. R. Civ. P. 54(c) (stating "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); King v. STL Consulting LLC, No. 05 CV 2719, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated in awarding damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages); and (3) the amount of money potentially involved – the more money involved, the less justification for entering the default judgment. Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). Additionally, the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and whether the default judgment might have a harsh effect on the defendant. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 62 (2d Cir. 1981).

The burden is on the plaintiff to establish its entitlement to recovery. See Clague v. Bednarski, 105 F.R.D. 552, 553 (E.D.N.Y. 1985). When a default judgment is entered, the defendant is deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability. See Greyhound ExhibitGroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993). For the purposes of an inquest, a court accepts as true

9

all factual allegations in the complaint, except those claims relating to damages. See Au Bon
Pain Corp. v. Artect, Inc., 653 F.2d at 65.

Here, it is beyond dispute that defendants are in default. Defendants have not responded
to the Complaint, nor have defendants even appeared in this action by counsel. The failure by
the corporate defendants to obtain counsel in this case constitutes a failure to defend because the
corporate defendants, as corporations, cannot proceed in federal court pro se. See Shapiro,
Bernstein & Co. v. Cont'l Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam) (stating
that "it is settled law that a corporation cannot appear other than by its attorney"); see also Jones
v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983) (discussing the rationale for
requiring corporations, as "artificial" entities, to appear through counsel only). Moreover,
despite proper service, defendants have not only failed to file an Answer or otherwise move with
respect to the Complaint, but defendants have also failed to respond either to plaintiff's Motion
for a Default Judgment or the Order from this Court relating to the calculation of damages, see
Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (holding that "[the defendant's] default is
crystal clear – it does not even oppose this motion"), and thus, plaintiff's evidence on damages is
undisputed.

Here, defendants' failure to appear in this action or respond to the Complaint and Motion
for a Default Judgment warrant the entry of default judgment.


B.      Federal Law Claims

Plaintiff alleges claims of unfair competition and false designation of origin under
Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); of trademark dilution under Section 43(c)

10

of the Lanham Act, 15 U.S.C. § 1125(c); and of federal trademark cyberpiracy under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

In explaining the objectives of the Lanham Act, the Supreme Court noted that the Act "'does not exist to reward manufacturers for their innovation in creating a particular device;' . . . but rather, by preventing competitors from copying 'a source-identifying mark,' 'reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a producer that it. . . will reap the financial, reputation-related rewards associated with a desirable product.'" Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 42 (2003) (quoting Tratflix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 34 (2001) and Qualitex Co., v. Jacobson Products Co., 514 U.S. 159, 163-64 (1995)).

### 1.    Unfair Competition

Plaintiff seeks damages based on defendants' use of plaintiff's mark in commerce, thereby misappropriating the good will associated with plaintiff's mark. Based on the allegations in the Complaint, plaintiff has established liability for unfair competition against the defendants under federal trademark law.

Section 43(a) of the Lanham Act prohibits a person from using "any word, term, name, symbol, or device, or any combination thereof," 15 U.S.C. § 1125(a)(1), "which. . . is likely to cause confusion. . .or to deceive as to the. . .origin, sponsorship, or approval of his or her goods. . ." 15 U.S.C. § 1125(a)(1)(A). See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114-16 (2d Cir. 2006). To establish a claim of unfair competition under Section 43(a), plaintiff must demonstrate: 1) defendants' use in commerce, 2) in connection with any sale or offering for sale or distribution of any goods, 3) of any word, term, name or symbol or false

11

designation of origin, 4) which is likely to deceive as to the affiliation, connection, or association of defendants with plaintiff, or as to the origin, sponsorship, or approval of defendants' goods by plaintiff. 15 U.S.C. § 1125(a)(1)(A).

Before the Court can determine whether a plaintiff has established a claim for unfair competition under the Lanham Act, "[a] plaintiff must demonstrate its own right to use the mark or dress in question." ITC Limited v. Punchgini, Inc., 482 F.3d at 154. Plaintiff must show priority of right over defendants in order to be entitled to relief. See P. Daussa Corp. v. Sutton Cosmetics (P. R.), Inc., 462 F.2d 134, 136 (2d Cir. 1972).

In Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993), the Second Circuit held that, in order to sustain a cause of action for trademark infringement under Section 43(a) of the Lanham Act, the plaintiff must establish two elements: 1) that "the mark or dress is distinctive as to the source of the good or service at issue," and 2) "that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant." ITC Limited v. Punchgini, Inc., 482 F.3d 135, 154 (2d Cir.) (describing the "Gruner test"), cert. denied, 552 U.S. 827 (2007); see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 115 (reciting the two-prong Gruner test).

Under the second prong of the Gruner test, the Court must determine whether there is a "likelihood of confusion." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 115. "Likelihood of confusion is the keystone of trademark infringement." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 430 (S.D.N.Y. 2004), aff'd in part, vacated in part, and remanded, 454 F.3d 108 (2d Cir. 2006). In Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961), the Second Circuit set out a non-

12

exclusive, multi-factor test that considers, among other things: "(1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8) the sophistication of the consumers." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d at 116.

Plaintiff here has alleged that it has the exclusive right to use the mark at issue, that such mark is inherently distinctive as to the source of its goods, and that it is in fact a "famous" mark. (Compl. ¶¶ 11-18, 82-84, 91-93, 127-28). Plaintiff alleges that it has operated its business under the mark "studylogic" and identified its product under that mark for more than five years, since the inception of the company. (Id. ¶¶ 14, 17). Plaintiff claims that the mark is not only exclusive and distinctive, but allows consumers to identify the mark with plaintiff and its products. (Id. ¶¶ 16, 17).

Further, plaintiff has alleged that defendants used the mark in connection with the offering of their own goods by directing viewers of the domain to defendants' own websites and by advertising for a competitor of plaintiff's corporate client on the domain. (Id. ¶¶ 37, 42, 65). In addition, plaintiff claims that there is a likelihood of confusion between the plaintiff's goods and those of the defendants. (Id. ¶ 68). Plaintiff alleges that defendants deceived consumers and misappropriated the good will associated with plaintiff's common-law marks to attract consumers into believing that plaintiff is somehow related to or endorses defendants' products. (Id. ¶¶ 61, 63). This constitutes unfair competition under 15 U.S.C. § 1125(a). See Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc., 874 F.2d 95, 102 (2d Cir. 1989). "One cannot sell his product by misappropriating the goodwill of another through misleading the public into

13

thinking that it is sponsored by or derived from something else." American Footwear Corp. v. General Footwear Co. Ltd., 609 F.2d 655, 662 (2d Cir. 1979).

> 2.    Trademark Dilution

Plaintiff seeks damages based on defendants' use of plaintiff's mark in commerce, thereby impairing the distinctiveness of or tarnishing plaintiff's mark. Based on the allegations in the Complaint, plaintiff has established liability for trademark dilution against the defendants under Section 1125(c)(1) of the Lanham Act.

Section 43(c)(1) of the Lanham Act provides that "the owner of a famous mark that is distinctive. . .shall be entitled to an injunction against another person who. . .commences use of a mark in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual injury." 15 U.S.C. § 1125(c)(1). See Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 110-11 (2d Cir.), cert. denied, 131 S. Ct. 647 (2010).[9]

"'Dilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Dilution by blurring refers to "the whittling away of [the] established trademark's

---

[9]The Lanham Act also allows the owner of the famous mark to be awarded monetary damages, attorneys' fees, and costs under 15 U.S.C. § 1117(a), subject to the discretion of the court, 15 U.S.C. § 1125(c)(5), if 1) the mark that is likely to cause dilution by blurring or tarnishment was first used in commerce by the person against whom the injunction is sought after October 6, 2006, 15 U.S.C. § 1125(c)(5)(A); and 2) the person against whom the injunction is sought willfully intended to trade on the recognition of the famous mark or willfully intended to harm the reputation of the famous mark. 15 U.S.C. § 1125(c)(5)(B). Since plaintiff has alleged that defendants first used plaintiff's mark in commerce in April 2006, before the date set out in the statute as the earliest date for which monetary damages are allowed under Section 43(c), the Court does not address monetary damages under plaintiff's trademark dilution claims.

14

selling power and value through its unauthorized use by others." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 111 (quoting Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 105 (2d Cir. 2009)). "In contrast to dilution by blurring, 'dilution by tarnishment'. . .'generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product.'" Id. (quoting Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir. 1994)).

With respect to its trademark dilution claim, plaintiff must establish 1) defendants' use in commerce, 2) after the owner's mark has become famous, 3) that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark. 15 U.S.C. § 1125(c)(1). See Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd., 812 F. Supp. 2d 186 (E.D.N.Y. 2011); Gap, Inc. v. G.A.P. Adventures Inc., No. 07 CV 9614, 2011 WL 2946384, at *16 (S.D.N.Y. Jun. 24, 2011). "Whether a mark or trade name is likely to cause dilution by blurring depends on factors including the similarity between the mark and the famous mark, the distinctiveness and degree of recognition of the famous mark, and whether the user of the mark or trade name intended to create an association with the famous mark." Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd., 812 F. Supp. 2d at 194 (citing 15 U.S.C. § 1125(c)(2)(B)).

Plaintiff has alleged that it owned the "studylogic" mark, that defendants used the mark in commerce to market their services, after the mark became famous within the food and beverage industries. Plaintiff further alleges that defendants' conduct was willful in that defendants registered the domain, using plaintiff's mark, in defendants' own name with the bad faith intent to trade on consumers' recognition of the mark, resulting in injury to plaintiff. Plaintiff claims that defendant Fromer used plaintiff's domain to advertise for Nadin Tea and Coffee ("Nadin

15

Tea"), a Russian tea and coffee brand affiliated with Fromer, who is a former citizen of the Soviet Union. (Nahmias Decl. ¶ 23). Plaintiff claims that it never authorized the use of its site to advertise these products and that a client of plaintiff's who sells coffee and tea contacted plaintiff to inquire as to why this competitor, Nadin Tea, was being advertised on plaintiff's site. (Id. ¶ 24). Plaintiff alleges that not only did this cause great embarrassment to plaintiff, but it diluted the mark and harmed plaintiff's reputation. (Id.)

Accordingly, the Court finds that plaintiff has adequately alleged its claim for trademark dilution.

### 3. Trademark Cyberpiracy

The Court also finds that plaintiff's allegations adequately state a claim under the cyberpiracy provisions of the Lanham Act. Under the relevant provisions, "a person shall be liable in a civil action by the owner of a mark. . .if, without regard to the goods or services of the parties, that person" 1) "has a bad faith intent to profit from that mark," 15 U.S.C. § 1125(d)(1)(A)(i); and 2) "registers, traffics in, or uses a domain name that

. . .is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d)(1)(A)(ii). Section 43(d) of the Lanham Act was enacted "to prevent cybersquatting, an expression that has come to mean the bad faith and abusive registration and use of the distintive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks." New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 323-24 (S.D.N.Y. 2010).

With respect to its claim of cyberpiracy by the defendants, plaintiff must establish that 1) the mark was distinctive or famous at the time the domain name was registered, 2) the infringing

16

domain name complained of is identical to or confusingly similar to plaintiff's mark or dilutive in the case of a famous mark, and 3) defendant had a bad faith intent to profit from that mark. 15 U.S.C. § 1125(d)(1). See Mamiya America Corp. v. HuaYi Brothers, Inc., No. 09 CV 5501, 2011 WL 1322383, at *4 (E.D.N.Y. Mar. 11, 2011); New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d at 324.

Plaintiff's allegations adequately state a claim under the cyberpiracy provisions of the Lanham Act in that plaintiff has alleged that the mark was distinctive at the time the domain name was registered. (Compl. ¶ 17). Moreover, there is no question that the name registered by defendants was identical to plaintiff's mark; defendants were hired to register plaintiff's name. (Id. ¶ 19). Finally, plaintiff has alleged that defendants acted in bad faith with the intent to profit from their wrongdoing, thus stating a claim under 15 U.S.C. § 1125(d)(1). (Id. ¶ 67).

Plaintiff alleges that defendant Fromer transferred the domain name to Clear Net and then tried to sell it in order to insulate Safety Shield from liability. (Compl. ¶ 55). According to plaintiff, Fromer currently has 72 domains and 103 historical names registered in his name, and there was no legitimate reason for registering the "studylogic" domain in Safety Shield's name, nor was there any reason not to transfer it to plaintiff. (Id. ¶¶ 56-58). Indeed, in his Declaration, Mr. Nahmias asserts that Study Logic has discovered other instances where defendant Fromer failed to deliver goods and services, including problems with his own partner, and in connection with another website, Alibaba.com. (Nahmias Decl. ¶ 22).

Accordingly, plaintiff has established its claim of cyberpiracy against the defendants.

17

C.   New York State Law Claims

1.   New York Common Law and General Business Law

Plaintiff also seeks damages based on the defendants' violation of New York State's
common law prohibition on unfair competition and violations of New York General Business
Law §§ 349 and 360-l.

To prove its claim of unfair competition under New York common law, plaintiff must
demonstrate the same elements needed to prove liability for unfair competition under the Lanham
Act, coupled with evidence that defendants acted in bad faith. See Phillip Morris USA Inc. v.
Cruz, No. 11 CV 3220, 2012 WL 1744992, at *2 (E.D.N.Y. Apr. 16, 2012); Fendi Adele S.R.L.
v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 389 (S.D.N.Y. 2010); Phillip Morris USA Inc.
v. Felizardo, No. 03 CV 5891, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004) (citing
Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)).  Given the
allegations in plaintiff's Complaint relating to defendants' conduct and the intent of defendant
Fromer, the Court finds that plaintiff has adequately stated a claim under New York common
law.

Under Section 349 of New York General Business Law, plaintiff must establish that 1)
defendants' deceptive acts were directed at consumers; 2) the acts were materially misleading,
and 3) plaintiff was injured as a result of this deception.  See Maurizio v. Goldsmith, 230 F.3d
518, 521 (2d Cir. 2000); Gristede's Foods, Inc. v. Unkechauge Nation, 532 F. Supp. 2d 439, 450
(E.D.N.Y. 2007); Imig, Inc. v. Electrolux Home Care Products, Ltd., No. 05 CV 529, 2007 WL
900310, at *15 (E.D.N.Y. Mar. 22, 2007).  Under Section 360-l, plaintiff must establish that 1)
its mark is inherently distinctive or has acquired secondary meaning; and 2) there is a likelihood

18

of dilution. See N.Y. Stock Exch., Inc. v. N.Y. Hotel, LLC, 293 F.3d 550, 557 (2d Cir. 2002);

New Sensor Corp. v. CF Distribution LLC, 303 F. Supp. 2d 304, 317 (E.D.N.Y. 2004); Pfizer,

Inc. v. Y2K Shipping & Trading, Inc., No. 00 CV 5304, 2004 WL 896952, at *8 (E.D.N.Y. Mar.

26, 2004).

Based on the allegations in the Complaint, it appears that plaintiff has stated valid claims

under Sections 349 and 360-l of New York General Business Law.

### 2. Breach of Contract

Turning to plaintiff's breach of contract claim, it is well-established under New York law

that a party alleging an action for breach of contract must prove the following: "(1) a contract;

(2) performance; (3) breach by the other party; and (4) damages." First Investors Corp. v. Liberty

Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998) (quoting Rexnord Holdings, Inc. v. Bidermann,

21 F.3d 522, 525 (2d Cir. 1994)).

Here, with respect to the first element – the existence of a contract – the Court finds that

plaintiff has sufficiently alleged that the parties entered into a contract in which it was agreed that

defendants[10] would register the "studylogic" domain in exchange for an agreed-upon price.

Plaintiff alleges that despite payment in full, defendants never transferred the site to plaintiff as

agreed and indeed, tried to sell the site without plaintiff's authorization. Thus, the Court finds

that plaintiff has adequately alleged the elements necessary to state a breach of contract claim:

that plaintiff duly performed its contractual obligations; that the defendants materially breached

the contract; and that plaintiff has suffered damages. Having alleged each element of the cause

---

[10]Although only Safety Shield was explicitly made party to the contract with Study Logic,
the Court finds that Clear Net and Fromer are jointly and severally liable for plaintiff's breach of
contract claim, as well as its claims under federal law. (See discussion, Part I D. infra).

19

of action, plaintiff has adequately alleged its state law claim for breach of contract.

### 3) Breach of Fiduciary Duty

Plaintiff has alleged that, by virtue of its contract with defendants, defendants owed plaintiff a fiduciary duty of loyalty and good faith and that defendants breached this duty by advancing their own interests to the detriment of plaintiff Study Logic. (Compl. ¶¶ 145, 146). Where a breach of fiduciary duty claim "arise[s] from the same alleged conduct that form[s] the basis of [a] breach of contract claim," the claims are duplicative. Clarendon Nat. Ins. Co. v. Health Plan Administrators, No. 08 CV 6279, 2009 WL 3053736, at *4 (S.D.N.Y. Sept. 24, 2009); see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing Inc., 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) (holding that "In New York, a cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand"); Balta v. Ayco Co., LP, 626 F. Supp. 2d 347, 361 (W.D.N.Y. 2009) (finding that, where the "fiduciary duties allegedly breached. . .arose, expressly or impliedly, under the contract, and the parties had no relationship of trust apart from their contractual relationship," plaintiff's fiduciary duty claims were duplicative of its contract claims).

Here, plaintiff has not alleged "a relationship of trust apart from their contractual relationship." Balta v. Ayco Co., LP, 626 F. Supp. 2d at 361. Instead, plaintiff alleges that defendants owed plaintiff Study Logic a fiduciary duty "by virtue of the contract" and "the services to be performed under the contract." (Compl. ¶¶ 144, 145). According to plaintiff, defendants breached this duty by failing to perform under the contract and using the domain to advance their own interests. (Compl. ¶¶ 147-150).

Accordingly, plaintiff's breach of fiduciary duty claim is duplicative of its breach of

contract claim.

D. Individual Liability

Plaintiff alleges that defendant Fromer should bear personal liability for two reasons: first, he completely dominated the two corporate entities, conducting his own business using the corporations and failing to follow corporate formalities (Compl. ¶¶ 160-65); second, plaintiff claims that defendant Fromer used this domain to commit a fraud against plaintiff. (Id.)

With respect to plaintiff's federal law claims, individuals who are "moving, active, conscious force[s]" behind a corporation's infringement of a plaintiff's rights can be held personally liable under the Lanham Act. Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 913-14 (E.D.N.Y 1988). Demonstrating that a corporate officer "authorized and approved the acts of unfair competition which are the basis of the corporation's liability is sufficient to subject the officer to personal liability." Id. at 913. Plaintiff has alleged that the individual defendant is the controlling officer of the corporate defendants and was a direct participant in the aforementioned unfair competitive practices.

Accordingly, the Court respectfully recommends that Fromer be held personally liable for plaintiff's federal law claims for unfair competition, trademark dilution, and cyberpiracy.

With respect to plaintiff's state law claims, to pierce the corporate veil of Safety Shield and Clear Net under New York law, plaintiff must set forth facts showing: first, that Fromer "abused the corporate form by exerting such domination over the corporation or utilizing it for such personal gain that the corporation was a mere alter-ego," Plains Mktg., L.P. v. Kuhn, No. 10 CV 2520, 2011 WL 4916687, at *4 (E.D.N.Y. Oct. 17, 2011) (citing Morris v. N.Y. State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141, 623 N.E.2d 1157, 603 N.Y.S.2d 807 (1993)); and

21

second, that "maintaining the corporate form would sanction a fraud, illegality, or injustice against the plaintiff." Id.

Plaintiff alleges that defendant Fromer "completely controlled the policies and business practices of [d]efendants Safety Shield and Clear Net" in order to "[perpetrate] a fraud. . .upon [p]laintiff." (Compl. ¶¶ 164, 165). Further, plaintiff alleges that all communications with regard to the Project were made through defendant Fromer's personal email address and cell phone number (Id. ¶ 160), and that Fromer only executed the contract with plaintiff through Safety Shield in order to insulate himself from personal liability. (Id. ¶ 162). The Court finds that plaintiff has sufficiently alleged that Fromer abused the corporate form such that for the Court to maintain the corporate form in this case would sanction a fraud against the plaintiff.

Accordingly, the Court recommends that defendant Fromer be held personally liable for plaintiff's state law claims.

Finally, in light of plaintiff's allegation that Safety Shield's corporate status is currently inactive (Compl. ¶ 8), the Court feels compelled to consider whether defendant Clear Net should be held jointly and severally liable for damages awarded in this action. Plaintiff alleges that defendant Fromer completely controlled both Safety Shield and Clear Net (Compl. ¶¶ 164, 165) to the extent that the corporate defendants are the "alter-egos" or "instrumentalities" of defendant Fromer. (Id. ¶ 165). Plaintiff further claims that defendants transferred the domain from Safety Shield to Clear Net in order to continue their infringing activities and insulate themselves from liability (Id. ¶¶ 39, 42, 55). Based on these undisputed allegations, the Court respectfully recommends that all of the named defendants be held jointly and severally liable for any damages awarded to plaintiff Study Logic.

22

## II. Damages

### A. Legal Standard

It is well-settled that the burden is on the plaintiff to establish its entitlement to recovery. See Clague v. Bednarski, 105 F.R.D. 552 (E.D.N.Y. 1985). When a default judgment is entered, the defendant is deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability. See Greyhound Exhibit Group, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993); Montcalm Publ'g Corp. v. Ryan, 807 F. Supp. 975, 977 (S.D.N.Y. 1992) (citing United States v. Di Mucci, 879 F.2d 1488, 1497 (7th Cir. 1989)); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65; Deshmukh v. Cook, 630 F. Supp. 956, 959-60 (S.D.N.Y. 1986); 6 Moore's Federal Practice ¶ 55.03[2] at 55-16 (2d ed. 1988). However, the plaintiff must still prove damages in an evidentiary proceeding at which the defendant has the opportunity to contest the claimed damages. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158. "'While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation.'" Levesque v. Kelly Communications, Inc., No. 91 CV 7045, 1993 WL 22113, at *4 (S.D.N.Y. Jan. 25, 1993) (quoting Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)).

### B. Monetary Damages for Federal Claim of Unfair Competition

As discussed above, plaintiff has established liability for unfair competition, trademark dilution, and cyberpiracy against both the corporate and the individual defendants. Section 35 of the Lanham Act governs the types of monetary relief available in cases of trademark

23

infringement, unfair competition, and cyberpiracy. 15 U.S.C. § 1117. See Polo Fashions, Inc. v. Rabanne, 661 F. Supp. 89, 95 (S.D. Fla. 1986). The statute authorizes the plaintiff "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action" where plaintiff can establish a violation of his rights as a registered trademark holder. 15 U.S.C. § 1117(a).

Recognizing the difficulty in isolating the causation of diverted sales and measuring reputational harm, an award of defendant's profits is often used as a proxy for plaintiff's actual damages. AW Indus. Inc. v. Sleepingwell Mattress Inc., No. 10 CV 04439, 2011 WL 4404029, at *5 (E.D.N.Y. Aug. 31 2011) (quoting George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1539 (2d Cir. 1992)). To determine an appropriate award, the Court has broad discretion to use either defendant's profits or plaintiff's actual damages. See AW Indus. Inc. v. Sleepingwell Mattress Inc., 2011 WL 4404029, at *5. Thus, plaintiffs in a Lanham Act action are not limited to recovery of their actual damages but "may recover profits reaped by the defendants from their infringing activity." Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973 (2d Cir. 1985) (citing Monsanto Chem. Co. v. Perfect Fit Prod. Mfg. Co., 349 F.2d 389, 396-97 (2d Cir. 1965), cert. denied, 383 U.S. 942 (1966)).

It is clear that in determining what the proper compensation would be in a case of trademark infringement, the court has "broad equitable discretion," Taylor Made Golf Co. v. Carsten Sports, Ltd., 175 F.R.D. 658, 661 (S.D. Cal. 1997), and courts have considered a defendant's "willful and deliberate behavior" in fashioning an award that will act as an appropriate deterrent. Polo Fashions, Inc. v. Rabanne, 661 F. Supp. at 96; see also W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 662 (2d Cir. 1970) (finding "bad faith and wrongful intent"

24

and awarding profits where defendant's actions "are surrounded by an aura of indifference to plaintiff's rights and a smug willingness to determine unilaterally that the good will plaintiff had sought to foster could safely be treated as a nullity").

In assessing defendants' profits, plaintiff need only prove the amount of defendants' sales; defendants bear the burden of proving the amount of costs and other deductions to determine profit. AW Indus. Inc. v. Sleepingwell Mattress Inc., 2011 WL 4404029, at *6. Where, as here, a defendant's refusal to participate in discovery prevents the plaintiff from providing precise proof of defendant's sales and profits, courts have relied on information to estimate profits and award damages that are "reasonable, even if imprecise." Taylor Made Golf Co. v. Carsten Sports, Ltd., 175 F.R.D. at 663 (using United States Commerce Department figures to estimate profits where defendant failed to participate in discovery); see also Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d at 972-73 (noting that court may have to rely on "indirect and circumstantial evidence" if defendant fails to produce evidence on damages); Polo Fashions, Inc. v. Rabanne, 661 F. Supp. 89 (collecting cases).

As the court in Taylor Made Golf Co. v. Carsten Sports, Ltd. noted: "[p]roof of actual damages or profits is not necessary, as it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. Thus, the court may rely on circumstantial evidence of the extent of the defendant's wrongdoing to assess damages." 175 F.R.D. at 663 (internal citations omitted). Any "'doubts about the actual assessment of damages will be resolved against the party who frustrates proof of such, and the fact finder may calculate damages at the highest reasonable ascertainable value.'" Id. (quoting Nintendo v. Ketchum, 830 F. Supp. 1443, 1445-46 (M.D. Fla. 1993)); see also Louis

25

Vuitton, S.A. v. Spencer Handbags Corp., 765 F.2d at 972 (noting that where defendants had refused to produce any records, "defendants must bear the burden of uncertainty").

Here, defendants have been given numerous opportunities to provide plaintiff and this Court with accurate figures, but they have declined to participate in any of these proceedings. While plaintiff need only prove the gross amount of defendants' sales, Century 21 Real Estate LLC v. Paramount Home Sales, Inc., No 06 CV 2861 2007 WL 2403397 at *4 (E.D.N.Y. Aug 20, 2007) (allowing plaintiff to use reasonable estimates of profits), plaintiff here is unable to present any evidence relating to defendants' profits and has thus elected to seek statutory damages. See Sara Lee Corp. v. Bas of N.Y., Inc., 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999) (awarding statutory damages in a case where defendants failed to appear). Courts are given broad discretion within the statutory limits to impose an amount necessary to discourage further violations and to vindicate the policy behind the Act. See Phillip Morris USA, Inc. v. Marlboro Express, No. 03 CV 1161, 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005).

### 1. Statutory Damages

Under the statute, plaintiff is entitled to recover statutory damages of not less than $1,000 and not more than $100,000 for each pirated name. See 15 U.S.C. § 1117(d). "The Court has considerable discretion in determining an appropriate award of statutory damages and. . .the Lanham Act provides little guidance on how to proceed in any given case." Mamiya America Corp. v. HuaYi Brothers, Inc., 2011 WL 1322383, at *7. Despite the lack of guidance provided by the Lanham Act, "courts have found some guidance in the case law of an analogous provision of the Copyright Act. . . .Under the Copyright Act, courts look to factors such as: (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the

26

copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant." Martal Cosmetics, Ltd. v. Int'l Beauty Exch. Inc., 01 CV 7595, 2011 WL 3687633, at *23 (E.D.N.Y. Aug. 23, 2011) (internal citations and quotations omitted). "The statutory minimum award. . .is presumptively sufficient for purposes of deterrence and compensation where there is no reason to believe the violation was willful or that it resulted in any harm." Mamiya America Corp. v. HuaYi Brothers, Inc., 2011 WL 1322383, at *8.

Plaintiff here argues that the Court should consider not only the defendants' multiple acts of misconduct but their willfulness as well. See 15 U.S.C. § 1117(a). See Mamiya America Corp. v. HuaYi Brothers, Inc., 2011 WL 1322383, at *8 (awarding statutory damages above the statutory minimum because the defendant's violation was willful). The Court in Mamiya reasoned that "[the defendant's] willfulness" justifies "a ten-fold increase in the minimum award." See Mamiya America Corp. v. HuaYi Brothers, Inc., 2011 WL 1322383, at *8. Plaintiff's allegations as well as defendants' failure to participate in this action establish willfulness. See Kenneth Jay Lane v. Heavenly Apparel, Inc. No. 03 CV 2132, 2006 WL 728407 at *7 (S.D.N.Y. Mar. 21, 2006). Accordingly, the Court recommends at least a ten-fold increase in the minimum statutory award.

Further, the allegations in plaintiff's Complaint and the Declaration of Mr. Nahmias set forth instances in which plaintiff's customers were actually confused and complained about the use of the domain to advertise competing products. The Court finds that, based on the actual damage suffered by plaintiff due to defendants' infringement, a further doubling of statutory

27

damages is justified.

Accordingly, the Court awards plaintiff statutory damages in the amount of $20,000.

### 2. Enhanced Damages

Plaintiff seeks treble damages, as an enhancement of actual damages up to the maximum

allowed by statute.  (Pl.'s Mem.[11] at 17).  The Lanham Act permits the court to award "any sum

above the amount as found as actual damages, not exceeding three times the amount." 17 U.S.C.

§ 1117(a)(3); see also AW Indus. Inc. v. Sleepingwell Mattress Inc., 2011 WL 4404029, at *7.

Courts have held that treble damages may be appropriate where, as here, the infringer has

engaged in willful behavior.  See, e.g., Tanning Research Labs., Inc. v. Worldwide Import &

Export Corp., 803 F. Supp. 606, 610 (E.D.N.Y. 1992); Polo Fashions, Inc. v. Rabanne, 661 F.

Supp. at 98 (holding that where there is a case of "intentional and knowing counterfeiting

. . .profits are to be trebled in the absence of extenuating circumstances").  The purpose of

awarding treble damages is to provide "an economic deterrence to those who contemplate the

otherwise lucrative profession of counterfeiting."  Id. (citing Playboy Enterprises, Inc. v. Baccarat

Clothing Co., 692 F.2d 1272, 1274-75 (9th Cir. 1982)).  However, the Court should bear in mind

that the purpose of damages awarded under the Lanham Act is remedial, not punitive.  See 17

U.S.C. § 1117(a).

Since defendants have presented no evidence of extenuating circumstances, and this

Court finds none to exist in the record, there appears to be ample justification for awarding treble

damages in this case where defendants have no apparent justification for their conduct and have

---

[11]Citations to "Pl.'s Mem." refer to the Memorandum of Law in Support of Plaintiff
Study Logic LLC's Motion for Default Judgment and Order Granting Injunctive Relief, filed on
November 30, 2011.

28

clearly profited from their willful and intentional infringement. Therefore, because the Court finds that the requested enhancement of actual damages is appropriate, and will serve to adequately compensate plaintiff, rather than to penalize the defendants, the Court respectfully recommends that plaintiff be awarded treble damages in the amount of $60,000.00.

## C. Monetary Damages for State Law Claims

### 1. Statutory Damages

Plaintiff also seeks statutory damages of $50.00 pursuant to New York General Business Law § 349(h). Section 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action. . .to recover his actual damages or fifty dollars, whichever is greater. . . .The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section." N.Y. Gen. Bus. Law § 349(h). Plaintiff contends that had defendants participated in this action, plaintiff could potentially have recovered up to $1,000 by showing actual damages. Id. Accordingly, the Court awards plaintiff $50.00 in statutory damages based on defendants' violation of New York law.

### 2. Compensatory Damages for State Law Claims

Plaintiff argues that it is entitled to recover the $4,500 it paid to defendants as damages for the breach of contract and confidentiality agreement. (Pl.'s Mem. at 17). The Court has already recommended that plaintiff be awarded $60,000 in treble damages under the Lanham Act. However, the Court's rationale for finding that plaintiff has established its Lanham Act claims is not dependent on the existence of the underlying contract (see discussion, Part I B.,

29

supra), nor did the Court's determination of statutory damages factor in the value of the underlying contract. Accordingly, the Court finds that the damage to plaintiff caused by defendants' breach is sufficiently distinct from its federal law claims to justify awarding compensatory damages for breach of contract in addition to statutory damages under the Langham Act. Based on plaintiff's sworn statement that it paid defendants $4,500 to prepare and register its domain, the Court awards plaintiff $4,500 for defendants' failure to perform their obligations under the contract.

## D. Attorney's Fees

### 1. Standards Under the Lanham Act

Plaintiff requests $9,780.00 in attorneys' fees. (Pl.'s Mem., Ex. P). "Under the Lanham Act, courts are empowered to award reasonable attorneys' fees, however, only in exceptional cases." AW Indus. Inc. v. Sleepingwell Mattress Inc., 2011 WL 4404029, at *7. Attorneys' fees may be awarded in cases of "willful infringement." Patsy's Brand Inc. v. IOB Realty Inc., 317 F.3d 209, 221 (2d Cir. 2003), and willful infringement may be established by virtue of a defendant's default. See Kenneth Jay Lane v. Heavenly Apparel, Inc. No. 03 CV 2132, 2006 WL 728407 at *7 (S.D.N.Y. Mar. 21, 2006) (deeming defendant's infringement willful based upon default, but denying request for attorneys' fees because requisite data concerning fees not provided to the court); Tiffany(NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003) (holding that: "By virtue of the default, [the defendants'] infringement is deemed willful"). In this case, where defendants have failed to respond to the Complaint and where plaintiff's evidence clearly demonstrates willful infringement, the Court respectfully recommends that

30

plaintiff be awarded attorneys' fees.

        2. Rates Requested

To determine whether plaintiff's request for attorneys' fees is reasonable, the Second

Circuit uses the "presumptively reasonable fee." This standard "boils down to what a reasonable,

paying client would be willing to pay, given that such a party wishes to spend the minimum

necessary to litigate the case effectively," Simmons v. Transit Auth., 575 F. 3d 170, 174 (2d Cir.

2009) (internal citations omitted), bearing "in mind all of the case-specific variables that. . .courts

have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly

rate." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty of Albany & Albany Cnty.

Bd. Of Elections, 522 F.3d 182, 190 (2d Cir. 2008). Courts have broad discretion in determining

the reasonable rate, but they should consider the prevailing hourly rates of the district where they

sit, and may consider other case specific variables such as the complexity of the case and the

attorney's level of expertise. Simmons v. Transit Auth., 575 F.3d at 174-75; Arbor Hill

Concerned Citizens Neighborhood Ass'n v. Cnty of Albany & Albany Cnty. Bd. Of Elections,

522 F.3d at 186-87, 190.

In Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany, 522

F.3d at 183-84, the Second Circuit "'abandon[ed]' the 'lodestar' approach to awarding attorney's

fees," which was "the product of the attorney's usual hourly rate and the number of hours

worked, which could then be adjusted by the Court to set 'the reasonable fee.'" Simmons v. New

York City Transit Auth., 575 F.3d 170, 170, 175 (2d Cir. 2009) (citing in part Arbor Hill

Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d at 187)). However, the

United States Supreme Court has since spoken in favor of the lodestar method as the preferred

approach for determining attorney's fees in the context of a federal fee-shifting provision. See Perdue v. Kenny A., – U.S. –, 130 S. Ct. 1662, 1671-72 (2010). In explaining its preference for the lodestar approach, the Court noted both that the lodestar approach has "achieved dominance in the federal courts" and that it has "become the guiding light of our fee-shifting jurisprudence." Perdue v. Kenny A., 130 S. Ct. 1662 at 1672 (quoting Gisbrecht v. Barnhart, 535 U.S. 789, 801 (2002)). It also explained that the lodestar method is preferable because it results in more accurate attorney's fee awards and because it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." Id.

Nonetheless, the Supreme Court did not explicitly reject the Second Circuit's approach, and Arbor Hill has not yet been revisited by the Circuit in light of Perdue. Thus, the vast majority of courts in this Circuit still cite the approach articulated in Arbor Hill.[12] Accordingly, this Court applies the Arbor Hill factors in determining the "presumptively reasonable fee," which in this case, produces the same recommended fee as under a traditional lodestar analysis.

The Second Circuit has held that in calculating the presumptively reasonable fee, "courts 'should generally use the hourly rates employed in the district in which the reviewing court sits.'" Simmons v. New York City Transit Auth., 575 F.3d at 174 (holding that when awarding

---

[12]This Court conducted a broad search of decisions in New York's district courts, and found that the vast majority of decisions issued since Perdue still rely upon Arbor Hill. See, e.g., Greathouse v. JHS Sec., Inc., No. 11 CV 7845, 2012 WL 3871523, at *9 (S.D.N.Y. Sept. 7, 2012); S.M. v. Taconic Hills Cent. School Dist., No. 09 CV 1238, 2012 WL 3929889, at *4 (N.D.N.Y. Sept. 10, 2012); Archbold v. Tristate ATM, Inc., No. 11 CV 5796, 2012 WL 3887167, at *6-7 (E.D.N.Y. Sept. 7, 2012). But see Harris v. Fairweather, No. 11 CV 2152, 2012 WL 3956801, at *7, n.21 (S.D.N.Y. Sept. 10, 2012) (analyzing the request for attorneys' fees under the lodestar approach, noting that "[t]he Supreme Court's Perdue opinion appears to cast doubt on the viability of the Second Circuit's 2008 opinion in Arbor Hill, which relied on the Johnson factors").

attorney's fees, there is a presumption in favor of relying on the rates where the case is litigated, not where the attorneys are located) (citations omitted). However, this Court must proceed with "limited guidance," because, "[s]ubsequent to Arbor Hill and Simmons, this district has considered the reasonable hourly rate issue in an intellectual property setting where a default has occurred in. . .few cases." Blue Moon Media Group, Inc. v. Field, No. 08 CV 1000, 2011 WL 4056068, at *12 (E.D.N.Y. Apr. 11, 2011) (recommending reducing rates requested in an intellectual property default case to $400 per hour for a senior associate/partner and $210 to $325 per hour for associates).

In this case, plaintiff employed Jonathan E. Neuman, Esq., who appears to be a sole practitioner with an office in Queens. According to plaintiff's papers, Study Logic is being charged $300 per hour for the services performed by Mr. Neuman in this case. (Pl.'s Mem., Ex. P). According to the firm's website, Mr. Neuman has a general practice engaged in real estate, trusts and estates, landlord-tenant, debt harassment, and intellectual property practice and litigation.[13] According to the contemporaneous time records submitted by Mr. Neuman in accordance with New York Association of Retarded Children v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983), Mr. Neuman billed 32.6 hours in connection with this matter.

Having reviewed the fee applications of counsel and considered the rates being requested, the Court finds that the rate of $300 per hour is in line with fees generally considered reasonable in the Eastern District of New York for this type of work. Following the decision in Simmons, rates of approximately $300 to $400 per hour for partners and $150 to $300 for associates have

---

[13]The firm's website entry for Mr. Neuman does not indicate Mr. Neuman's level of experience, and he has failed to submit any information regarding his experience or educational background.

33

been considered reasonable in the Eastern District. See, e.g., Gutman v. Klein, No. 03 CV 1570, 2009 WL 3296072, at *3 (E.D.N.Y. Oct. 13, 2009) (awarding attorney's fees due to spoliation of evidence). See also BBY Solutions, Inc. v. Schwartz, No. 11 CV 0947, 2011 WL 6986937, at *7 (E.D.N.Y. Nov. 17, 2011) (limiting rate of partners to $400 and approving rates of associates ranging from $150 to $310 per hour, based on years of experience); Melnick v. Press, No. 06 CV 6686, 2009 WL 2824586, at *9 (E.D.N.Y. Aug. 28, 2009) (holding that rates in the Eastern District vary from $200 to $375 per hour for partners and $100 to $295 per hour for associates); Moran v. Sasso, No. 05 CV 4716, 2009 WL 1940785, at *4 (E.D.N.Y. July 2, 2009) (stating that in the Eastern District of New York, reasonable hourly rates have ranged from $200 to $350 for partners and $200 to $250 for senior associates); Duverger v. C & C Duplicators, Inc., No. 08 CV 0721, 2009 WL 1813229, at *2 (E.D.N.Y. June 25, 2009) (stating that rates from $200 to $350 for partners and $200 to $250 for senior associates are reasonable); Rodriguez v. Pressler & Pressler, LLP, 06 CV 5103, 2009 WL 689056, at *1 (E.D.N.Y. Mar. 29, 2009) (holding that hourly rates of $450 and $300 were reasonable for a Fair Debt Collection Practices Act case).

Although this case involves trademark matters which may be more complicated than some cases and require a certain amount of specialized expertise, the work that was performed in this case was relatively straightforward. Much of the time in this case was spent in drafting the Complaint and the papers in connection with the default. (See Pl.'s Mem., Ex. P). Under these circumstances, the Court finds that the rate requested is reasonable and will apply the rate of $300 per hour for Mr. Neuman's work.

### 3. Hours Billed

Turning to the number of hours billed for this matter, plaintiff seeks a total award of fees,

34

representing 32.6 hours of work by Mr. Neuman. (Pl.'s Mem., Ex, P).

In accordance with the requirements of Carey, 711 F.2d at 1148, plaintiff has submitted a computer-generated printout of its attorney's contemporaneous time records, showing the dates worked and the amount of time spent on this case, along with a precise description of the tasks performed. According to the invoices submitted, Mr. Neuman spent 13.5 hours researching, drafting and editing the Complaint, and another 13.8 hours researching and preparing the papers in support of the default motion. The majority of the remaining hours were spent prior to the filing of the action, discussing the case with plaintiff and attempting to discuss the case with defendant Fromer. For example, Mr. Neuman spent 2.8 hours traveling to meetings with plaintiff and in telephone conferences and email exchanges with plaintiff, reviewing the evidence and history of the case. Counsel also spent 2.5 hours preparing emails and correspondence to Mr. Fromer warning him of the violations.

Having reviewed the plaintiff's submissions, the Court finds the number of hours requested by plaintiff to be reasonable and awards plaintiff $9,780.00 in attorneys' fees.

### E. Costs

Plaintiff also seeks an award of disbursements and costs in the amount of $605.64 in costs. (Neuman Decl. ⁙ 10). Under the Lanham Act, the prevailing party is entitled to recover its reasonable costs in pursuing the action. 15 U.S.C. § 1117; Fed. R. Civ. P. 54(d). The plaintiff may recover only those costs "necessary to cure the effects of the harm caused by the violation." Eu Yan Sang Intern. Ltd. v. S&M enters. (U.S.A) Enterprise Corp., No. 09 CV 4235, 2010 WL 3824129 at *5 (E.D.N.Y. Sept. 8, 2010). "[S]ubject to the principles of equity," costs are

35

awarded in default, see Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d at 170-71 (citing 15 U.S.C. § 1117(a)), but the "plaintiff bears the burden of justifying the requested costs." Eu Yan Sang Intern. Ltd. v. S&M enters. (U.S.A) Enterprise Corp., 2010 WL 3824129 at *5.

Plaintiff seeks reimbursements for its filing fees and service of process fees.[14] These costs are those normally subsumed by the client during litigation, and so are appropriate to cure the effects of the infringing activity. Plaintiff has satisfied his burden by providing a contemporaneous and itemized accounting of each cost associated with this case. (Pl.'s Mem., Ex. P). Accordingly, the Court recommends that plaintiff be awarded a total of $605.64 in costs.

### F. Injunctive Relief

Plaintiff also asks the Court to issue a permanent injunction enjoining defendants from using the Study Logic mark and the www.studylogicdata.com domain. (Compl. at 25). Courts may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction.'" Dunkin' Donuts Inc. v. Peter Romanofsky, Inc., No. 05 CV 3200, 2006 WL 2433127, at *6 (E.D.N.Y. Aug. 8, 2006); Garis v. Uncut-RawTV, Inc., No. 06 CV 5031, 2011 WL 4404035, at *3 (E.D.N.Y. Jul. 5, 2011).

Section 43 of the Lanham Act provides for such relief: "The owner of a famous mark that is distinctive. . .shall be entitled to an injunction against another person who. . .commences use of a mark in commerce that is likely to cause dilution by blurring or dilution by tarnishment

---

[14]Specifically, plaintiff requests $350 in filing fees; $90.00 for service on the Secretary of State, and $164.65 for service on Fromer and Clear Net. (Pl.'s Mem., Ex. P).

36

of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual injury." 15 U.S.C. § 1125(c)(1). See Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 110-11. The Act further provides that "in any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). See Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 500 (2d Cir.), cert. denied, 530 U.S. 1262 (2000).

The Second Circuit has held that "a permanent injunction is warranted where a party has succeeded on the merits," Mamiya Am. Corp. v. Huayi Bros., Inc., 2011 WL 1322383, at *8 (citing Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006)), and establishes "(1) that is has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. at *9 (citing Salinger v. Colting, 607 F.3d 68, 77 (2d Cir. 2010)). Accordingly, since plaintiff Study Logic has established its Lanham Act claims by virtue of defendants' default, and thereby succeeded on the merits, it is entitled to an injunction if it establishes the remaining factors. See id.

"Irreparable injury in trademark cases is established where 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source' of the goods or services in question." Id. (quoting Lobo Enters., v. Tunnel., Inc., 822 F.2d 331, 333 (2d Cir. 1987)). A requisite for the Court to grant permanent injunctive relief is that purchasers of the product may be misled in the future. Brundy Corp. v.

37

Teledyne Indus., Inc., 748 F.2d 767, 772 (2d Cir. 1984). The Court's review of plaintiff's Complaint and the Declaration of Mr. Nachmias establish that defendants will likely continue to infringe the Study Logic mark and domain and that such use is likely to mislead consumers. Defendants have repeatedly ignored plaintiff's communications and they have failed to transfer the domain to plaintiff even after multiple requests. (Compl. ¶¶ 27, 32, 33, 36, 43-48, 50). Plaintiff has alleged that defendants' infringement has already caused confusion for one of its clients (Compl. ¶¶ 63, 65, 67-69), and it is likely that other customers intending to find Study Logic's website could be diverted to the domain.

Next, an adequate remedy at law exists if an injured party can be compensated by a monetary damages award. Borey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991). However, "in cases where confusion about the origin of goods or services leads to damage to reputation or loss of a potential relationship with a client that 'would produce an indeterminate amount of business in years to come, monetary damages are difficult to establish and are unlikely to present an adequate remedy at law." Mamiya Am. Corp. v. Huayi Bros., Inc., 2011 WL 1322383, at *9 (citing Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004)). If defendants do not transfer the www.studylogicdata.com domain, it may harm Study Logic's "reputation and business in ways that may be difficult to quantify and that will not lend themselves easily to monetary compensation." Id.

The balance of hardships also weighs in Study Logic's favor. Study Logic "faces the threat of irreparable harm to [its] reputation and good will," id. at *10, whereas an injunction would not prevent defendants from continuing their business or cause any other harm that would outweigh the likely harm to Study Logic if the Court does not grant an injunction. Finally, the

38

public interest will not be disserved by the issuance of a permanent injunction in this case. "The public has an interest in not being deceived — in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d at 344. Study Logic has established that defendants' actions are likely to cause consumers to be deceived; thus, it is in the public interest to issue a permanent injunction in this case.

Accordingly, the Court respectfully recommends that defendants be enjoined from using the Study Logic mark and Ordered to transfer the www.studylogicdata.com domain to plaintiff.

## CONCLUSION

The Court respectfully recommends that the plaintiff be awarded: $60,000 in enhanced damages ($20,000 in statutory damages trebled); $50 for New York State law violations; $4,500 for breach of contract; $9,780.00 in attorneys' fees; and $605.64 in costs, for a total judgment against the defendants of $74,935.64. Further, the Court respectfully recommends that plaintiff's request for a permanent injunction ordering defendants to transfer the domain and desist from using the Study Logic mark be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

39

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
       September 21, 2012

/s/ Cheryl L. Pollak

Cheryl L. Pollak
United States Magistrate Judge

40